# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

LONNIE ANTICO,                                   Case No. 1:11-cv-640

        Plaintiff,                              Spiegel, J.
                                                 Bowman, M.J.

   v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Lonnie Antico filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents four claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

### I. Summary of Administrative Record

In April 2008, Plaintiff filed applications both for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning December 31, 2007 due to both mental and physical impairments. After Plaintiff's claims were denied initially and upon reconsideration, he requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). In June, 2010, an evidentiary hearing was held before ALJ Donald Becher, at which Plaintiff was represented by counsel. (Tr. 25-80). At the hearing, the ALJ heard testimony from Plaintiff, from Plaintiff's live-in girlfriend (Nadine Sweet), and from a

vocational expert. On September 1, 2010, the ALJ denied Plaintiff's applications in a written decision. (Tr. 11-24).

The record on which the ALJ's decision was based reflects that Plaintiff was 46 years old at the time of the evidentiary hearing. Although Plaintiff completed school only through the tenth grade, he later obtained his GED. (Tr. 31). Plaintiff had past relevant work as a bakery helper, route delivery driver, construction worker, and sandwich maker. (Tr. 18, 73). However, Plaintiff has not worked since his alleged onset date. (Tr. 17).

Based upon the record and testimony presented, the ALJ found that Plaintiff had the following severe impairments: "mild degenerative changes of the lumbar spine with grade I retrolisthesis of L1 on L2; status-post ventral hernia repair; right knee complex bilateral meniscal tears with a bucket handle tear laterally; anterior cruciate ligament deficiency; medial and lateral compartment chondromalacia; large loose body in the anteromedial aspect of the knee joint; a depressive disorder; an anxiety disorder; and a history of polysubstance abuse." (Tr. 13). The ALJ concluded that none of Plaintiff's impairments alone or in combination met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subp. P, Appendix 1. (Tr. 14). Instead, the ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform a limited range of sedentary work, restricted by the following:

> The claimant can lift 20 pounds occasionally and 10 pounds frequently; stand/walk two hours in an eight hour day; sit six hours in an eight hour day; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally bend and stoop; and never crouch or crawl. The use of the right leg with foot controls should be limited to occasionally. The work should be limited to simple, routine and repetitive tasks; in a work environment free of fast-paced production requirements; involving only simple, work-related decisions; with few, if any workplace changes.

(Tr. 16). Based upon the testimony from the vocational expert, and given Plaintiff's age, education, work experience, and RFC, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 18). Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Social Security Regulations, and was not entitled to DIB or to SSI. (Tr. 19).

The Appeals Council denied Plaintiff's request for review. Therefore, the ALJ's decision stands as the Defendant's final determination. On appeal to this Court, Plaintiff first argues that the ALJ erred: (1) by improperly discrediting Plaintiff's credibility; (2) by using an incorrect legal standard in evaluating whether Plaintiff's impairments met Listing 12.05(C); (3) by failing to consider evidence of Major Depressive Disorder with Psychotic Features; and (4) by relying on VE testimony that did not accurately portray Plaintiff's limitations. As discussed below, the Court finds no error and therefore recommends that the Commissioner's decision be affirmed.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by

substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national

economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

## B. Plaintiff's Claims of Error

Plaintiff's four claims of error are discussed in a different sequence than he presents them, for the convenience of this Court. Plaintiff's second claim of error is addressed first, since it involves a question of law that impacts the standard of review.

### 1. Listing 12.05(C) and the Prior Award of Benefits

The administrative record reflects that Plaintiff previously received an award of benefits. Plaintiff filed both DIB and SSI applications for benefits in 1996, but his applications were initially denied, and he did not request reconsideration of that decision. (Tr. 84). Instead, Plaintiff filed new applications on August 7, 1998, which were also denied initially and on reconsideration. (*Id*.). After that denial, Plaintiff, represented by counsel, filed a timely request for an administrative hearing before an ALJ. Before an evidentiary hearing was held, an Attorney Advisor from the Office of Hearings and Appeals reviewed the record and issued a written decision, dated July 1999, that reopened the prior determination, and awarded benefits back to June 15, 1995. The Attorney Advisor's decision was based upon a determination that Plaintiff met Listing 12.05C, in light of evidence that Plaintiff had diagnoses of schizoaffective disorder and major depression, and a valid performance IQ of 70. (Tr. 86-87). Given the fully favorable decision of the Attorney Advisor, Plaintiff's request for a hearing was subsequently dismissed. (Tr. 89-91).

The award of benefits made in 1999 was terminated in 2003. While the record is not entirely clear as to the basis for termination, it appears that benefits were terminated due to Plaintiff's incarceration. (Tr. 304). Plaintiff requested an administrative hearing following

the termination of benefits, but his request for a hearing before an ALJ was dismissed in April 2006 when he failed to appear, and did not respond to the Notice to Show Cause for his failure to appear. (Tr. 93-95). As stated above, Plaintiff did not again apply for benefits until April 2008.

Plaintiff now argues that based upon the 1999 determination that he met Listing 12.05(C), the ALJ's denial of benefits in 2010 produces an inconsistent result that should not be allowed to stand. *See, e.g. Drummond v. Comm'r of Soc. Sec.*, 126 F.2d 837 (6th Cir. 1997). Plaintiff argues that the Secretary should be "bound" by the prior findings that Plaintiff met Listing 12.05C. Plaintiff suggests that the 1999 determination was based upon a qualifying IQ score of 70, and adaptive deficits that manifested themselves when he was a child. (Doc. 7 at 9).

It is worth noting that the Attorney Advisor's 1999 decision reflects no discussion at all of Plaintiff's adaptive deficits, and instead references only a single IQ score and Plaintiff's additional impairment of depression. The decision's silence on the issue of adaptive deficits is not entirely surprising given that in 1999, there was some ambiguity as to whether a claimant seeking to meet or equal Listing 12.05C must not only have a qualifying IQ score of 60 through 70, but also show "deficits in adaptive functioning" as suggested in the introductory paragraph. In fact, it was not until *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001) that the Sixth Circuit clarified that a claimant is also required to satisfy the "adaptive functioning" standard. Regardless of the reasoning for the 1999 determination that Plaintiff satisfied the criteria of Listing 12.05C (as the Listing was then interpreted), this Court must decide whether that 1999 determination was in any way binding on the ALJ in his review of Plaintiff's 2008 applications.

6

In *Drummond*, the Sixth Circuit held that "*res judicata* applies in an administrative law context *following a trial type hearing*." Id., 126 F.2d at 841 (emphasis added). Plaintiff argues that because his hearing request was dismissed only after a fully favorable decision by the attorney advisor, *Drummond* should still apply. Despite dictum in *Drummond* that would permit a broader interpretation to administrative decisions made without a hearing, the expansion of its holding has not been universally embraced by courts in the Sixth Circuit. To the contrary, another magistrate judge in this district recently rejected the type of expansive interpretation of *Drummond* that Plaintiff now seeks. *See Roark v. Comm'r of Soc. Sec.,* 2011 WL 6751190 (S.D. Ohio, Nov. 29, 2011)(holding that *Drummond* does not apply where claimant's prior award of benefits was made without a hearing and subsequently was terminated, and Secretary is evaluating a new application), *adopted* at 2011 WL 6750459 (Dec. 22, 2011); *but contrast, Harris v. Astrue,* 2010 WL 3909495 (S.D. Ohio, May 21, 2010)(applying dictum of *Drummond* to prior disability determination made by agency without a hearing), adopted at 2010 LEXIS 103008 (S.D. Ohio Sept. 29, 2010)(Rice, J.) and *Miller v. Astrue*, 2012 WL 220234 (S.D. Ohio, Jan. 25, 2012)(same).

Standing alone then, the procedural fact that Plaintiff's prior award of benefits was not made after a trial-type hearing precludes the *pro forma* application of *res judicata* under *Drummond*, or under the Acquiescence Ruling that embodies *Drummond*, AR 98-4(6), 1998 WL 283902. However, another difficulty with Plaintiff's argument is that he previously appealed - unsuccessfully- the termination of his benefits. While the record is unclear as to the reasons for that termination, benefits may be terminated for a variety of reasons,

including but not limited to improvement of a claimant's medical condition,[1] evidence that a claimant is earning significant income,[2] or imprisonment. To the extent that the Attorney Advisor's 1999 determination that Plaintiff was entitled to benefits may carry a presumption of continued eligibility in some circumstances, the Commissioner's 2003 determination that Plaintiff was no longer entitled to benefits arguably eliminated that presumption. *See Messer v. Astrue*, 2010 WL 4791956 at *5 (E.D. Ky., Nov. 18, 2010)(Reviewing denial of benefits in case involving new application after termination, the court noted that if *res judicata* were to be applied, it might be more appropriate to apply it to the subsequent termination of benefits rather than the prior award).

Indeed, courts have held that not only medical improvement, but a variety of non-medical reasons that support the termination of benefits may preclude application of *Drummond*. For example, even if a child has been determined to be disabled under a listing for mental retardation, there is no presumption of continuing disability when that child attains the age of majority, notwithstanding the perceived stability of IQ scores. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286-287 n. 1 (6th Cir. 1994). Instead, the Social Security Act requires redetermination of SSI benefits within one year after an individual attains the age of 18, in which a claimant must submit medical or other evidence

---

[1] A legally supportable finding of "improvement" can be found even in cases involving a prior determination of mental retardation. Most frequently this occurs when the original IQ determination was near the upper end of the 60-70 mild retardation range, and the claimant in question either has additional testing above that range that calls into question the validity of earlier scores, and/or no longer demonstrates deficits in adaptive functioning. *See, e.g., Beatty v. Comm'r of Soc. Sec.*, 2011 WL 4407557 *5 (E.D. Mich. Sept. 2, 2011)(rejecting, despite "some appeal," plaintiff's underlying argument that one cannot "recover" from mental retardation); *Trueax v. Astrue*, 2009 WL 87575 (S.D. Ohio, Jan. 12, 2009)(adopting Report and Recommendation and concluding that Plaintiff did not meet Listing 12.05 as an adult, despite award of SSI benefits for mental retardation as a child).

[2] In this case, Plaintiff's earnings reflected substantial gainful activity from work from 2005-2007.

to show she is disabled under adult standards. *See Lewis v. Comm'r of Soc. Sec.* 2011 WL 334850 *6 (N.D. Ohio, Jan. 31, 2011). Similarly, when benefits are terminated due to incarceration, a claimant is required to submit a new application and is not entitled to a presumption of continuing disability in the re-application. *See generally, Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008)(no presumption of disability where claimant's SSI benefits had been terminated following incarceration); *Messer v. Astrue*, 2010 WL 4791956 at *5 (E.D. Ky. Nov. 18, 2010)(plaintiff who at one time met Listing 12.05C for mental retardation was not entitled to resumption of benefits after incarceration under *Drummond*, but was instead required to submit new application subject to the five-step sequential evaluation process).

In sum, while no binding Sixth Circuit precedent forbids application of *Drummond* to cases such as this one, there is little reason to apply the rule when there has never been a trial-type hearing. Add to that the additional circumstances presented here - where the prior award was made more than a decade ago without clear analysis of Plaintiff's adaptive functioning, the prior award was terminated and unsuccessfully appealed, and Plaintiff has demonstrated intervening relevant work history - and this Court can find no reasons that favor expansion of *Drummond* to the facts presented in this case.

As an alternative to his legal argument, Plaintiff argues that the evidence supports a factual finding that he had both the requisite IQ score and early deficits in adaptive functioning, and therefore still meets Listing 12.05C. Other than the single reference to Plaintiff's IQ score of 70 in the 1999 Attorney Advisor's opinion, no medical evidence appears in the record to corroborate that score, nor is there evidence of what test was administered, or when such tests were administered. Nonetheless, and despite holding

that no presumption applies that Plaintiff meets Listing 12.05C, this Court will assume the validity of Plaintiff's IQ score. However, the Court does not agree that Plaintiff has demonstrated any deficits in adaptive functioning. Instead, I find substantial evidence to support the ALJ's conclusion that Plaintiff does not meet the Listing based upon his failure to show that element. (Tr. 15).

Plaintiff points to evidence that he was identified as a slow learner in elementary school, had an IEP, was on Ritalin, tended to get into trouble, and had low skills, requiring him to repeat first grade (Tr. 296, 496-497). However, many children who have no impairments "get into trouble" and are held back early in their elementary education for social, behavioral, or other reasons that do not translate to deficits in adaptive functioning or mental retardation. Plaintiff suggests that "there is no question that a child who was found to need Ritalin had a significant deficit in adaptive functioning." (Doc. 9 at 3). But Ritalin is most commonly prescribed for ADHD, a condition unrelated to mental retardation. *See* www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000606/ (Revision date January 1, 2011).

Contrary to Plaintiff's argument, substantial evidence in the record supports the ALJ's determination that Plaintiff does not show the required deficits in adaptive functioning as an adult, and did not show them as a child. Plaintiff's single IQ score is at the top end of the "mild" mentally retarded range, making evidence of his adaptive functioning all the more critical to the Listing determination. While Plaintiff was identified as a slow learner and held back in first grade, there is no clear evidence that he was placed in special education classes.[3] The record of Plaintiff's actual school performance is sparse, rating

---

[3] Plaintiff testified that he was in special education classes, (Tr. 44), but there are no corroborating records, and the lone school record reflects regular classes.

Plaintiff (at age 7) as "average" or "low average" in nearly all categories listed under the headings "Abilities," "Achievement," and "Perceptual Skills" in regular classes. (Tr. 496). The school psychologist's report found Plaintiff to be "below average but..above the Educable Mentally Retarded range of intelligence," with "achievement levels..within the average range for his present grade placement" in the regular first grade classroom. (Tr. 497). As an adult, Plaintiff was able to earn his GED (Tr. 387).

The ALJ also relied upon the more recent report of a consulting examining psychologist, Dr. Chiappone, who assessed Plaintiff's adult cognitive functioning as in the low-average range. (Tr. 335). In fact, notwithstanding the lone reference to Plaintiff's IQ score, there is no record that Plaintiff has ever been diagnosed mental retardation or even borderline intellectual functioning. (Tr. 15). Although the language of Listing 12.05 (which bears the heading: "Mental retardation") does not require a formal diagnosis of mental retardation, courts within the Sixth Circuit have considered the lack of any such diagnosis as one of several factors relevant to the determination of whether a claimant meets or equals Listing 12.05. *See, e.g., Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 676 (6th Cir., Dec. 18, 2009)(noting that no school records, and no therapist or psychologists, had ever mentioned mental retardation or intellectual deficiencies); *cf. Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007)("It is undisputed that no psychologist has diagnosed Cooper with mental retardation" despite a performance IQ score of 70).

Other evidence of Plaintiff's adaptive functioning, including his ability to obtain a driver's license, his work history, and his ability to live and function independently also support the ALJ's determination that Plaintiff did not meet or equal Listing 12.05C. As other courts have noted, many people with an IQ score lower than 70 remain capable of full-time

work and therefore do not meet the Listing. *See Thomas v. Comm'r of Soc. Sec.*, 2010 WL 1254788 *8 (N.D. Ohio, March 24, 2010) (recognizing that "many, if not most, mildly mentally retarded individuals will be able to work," quoting *Muntzert v. Astrue*, 502 F. Supp.2d 1148, 1157-58 (D. Kan. 2007)). "The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments...in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. at 677.

At this judicial review stage, Plaintiff's burden is "much higher" to the extent that Plaintiff must show that the finding the ALJ made is not supported by substantial evidence. *See Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at *6 (W.D. Mich., March 26, 2012). (low IQ test scores at age 12, special education classes and poor grades insufficient to reverse ALJ decision, where contrary evidence showed that the plaintiff had "adaptive skills which had allowed her to be employed in unskilled occupations for many years."). Based on evidence similar to that presented here, courts have upheld determinations that, notwithstanding a qualifying IQ score, a plaintiff has failed to show the requisite deficits in adaptive functioning. *Accord West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007)(affirming denial of listing where claimant with low IQ scores had diagnosis of borderline intellectual functioning, and evidence did not show deficiencies in adaptive functioning); *Daniels v. Comm'r of Soc. Sec.*, 70 Fed. Appx. 868 (6th Cir. 2003)(affirming denial of benefits under Listing 12.05 where claimant had current low IQ score, but psychologist observed she clinically appeared to function at a higher level, and lack of evidence presented by plaintiff coupled with evidence of work history and graduation from

high school supported determination that claimant did not exhibit deficits in adaptive functioning prior to age 22).

Despite some difficulties in learning, Plaintiff was able to work successfully and testified that he stopped working not because of mental retardation, but because of physical problems with his knee.[4]  (Tr. 41).  Although Plaintiff reported having no friends, he has obviously sustained some longer term relationships - he was formerly married, and currently has a live-in girlfriend.   He is able to cook and do household chores, cares for himself, shops with his girlfriend, has a driver's license, and uses public transportation without difficulty.  He testified that he can complete a job application without difficulty, with the exception of remembering his precise work history, and that he can perform basic accounting tasks, including managing his prior award of Social Security benefits.  (*See e.g.*, Tr. 33, 34, 351); *see also Jenkins v. Comm'r of Soc. Security*, 1:06cv552-SJD,  2008 WL 339790 (S.D. Ohio Feb. 6, 2008)(plaintiff who performed own personal care, drove, walked, shopped, did household chores and cared for young child did not demonstrate deficits in adaptive functioning).  Plaintiff reported that he used to enjoy reading for pleasure- mostly Stephen King novels - a fact that undermines any claim of deficits in language skills or literacy.[5]  Dr. Chiappone's report concerning Plaintiff's ability to follow instructions and concentrate also suggests a lack of adaptive functioning deficits. *Accord West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. at 699 (concluding that psychological evaluation that found claimant able to understand and retain simple instructions and maintain concentration and

---

[4] Despite Plaintiff's testimony that his knee issue was his primary physical symptom resulting in disability, Plaintiff failed to appear for a consultative examination of his knee.  (Tr. 45).

[5] Plaintiff testified that he no longer reads for pleasure due to his poor eyesight and difficulties with concentration.  (Tr. 62-63).

attention necessary to complete basic tasks "indicates that West did not exhibit deficiencies in adaptive functioning, and thus supports the ALJ's conclusion that West did not meet or equal Listing 12.05(C)."). The existence of contrary evidence does not mean that this Court must reverse, so long as substantial evidence supports the ALJ's conclusion, as it does in this case for the reasons explained above.

### 2. Consideration of Depression with Psychotic Features

Plaintiff argues that the ALJ erred by failing to specifically address Plaintiff's diagnosis of "Major Depression Disorder with Psychotic Features," and to incorporate greater or more severe limitations based upon Plaintiff's auditory hallucinations. At an initial visit on May 15, 2009 at Centerpoint Clinic where Plaintiff receives periodic treatment, a psychiatrist conducting an intake interview provided a handwritten diagnosis of "Major Depression chronic Recurrent" that, while difficult to read, appears to contain the additional notation "*with* Psychotic features." (Tr. 385-386, emphasis added). Aside from the issue of the legibility of the physician's handwriting, other records reflect ambiguity as to whether Plaintiff's depression did or did not include psychotic features. A typed report reflecting a diagnostic assessment of "Major Depression Recurrent Severe" but "*without* psychotic features" was completed a few weeks earlier, in March 2009, while Plaintiff was residing at a homeless shelter. (Tr. 393, emphasis added). Other records similarly report a diagnosis of depression "without" psychotic features or behavior. (Tr. 458, 469). Plaintiff also reported no hallucinations to Dr. Chiappone. (Tr. 334-335).

Assuming that the May 2009 note does reflect a diagnosis of depression with psychotic features, Plaintiff improperly characterizes that diagnosis in several ways. First, he describes it having been made by a "treating psychiatrist," even though it appears only

on an intake record.  Leaving aside the issue of whether an intake physician can be described as a "treating psychiatrist" on the basis of an initial visit, the description of the diagnosis as an opinion that was wrongly "rejected" by the ALJ without "good reasons" clearly goes too far.

On the record presented, the ALJ was not required to discuss in detail whether Plaintiff's "depressive disorder" was with or without psychotic features.  A diagnosis, in and of itself, is not conclusive evidence of disability because it does not reflect the limitations, if any, that it may impose upon an individual.  *See Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988)("The mere diagnosis..of course, says nothing about the severity of the condition.").  Here, no error occurred because the ALJ identified the depressive disorder, and properly accounted for all reasonable limitations resulting from that condition. The ALJ specifically stated that Plaintiff had been prescribed "psychotropic medication" (Tr. 14), and noted Plaintiff's testimony that he heard voices and took Abilify, which medication decreased Plaintiff's symptoms.  (Tr. 16).

Plaintiff argues that "it stands to reason that if the distraction of hearing his deceased baby's cries were included, it *may* have resulted in a 'marked' limitation" on Plaintiff's abilities in concentration, persistence or pace, instead of the "moderate" limitation found by the ALJ. (Doc. 9 at 4, emphasis added).  Plaintiff fails to back up his speculative argument by citation to medical evidence.  Other than his own hypothesis, Plaintiff points to no opinion of any physician or psychologist, either treating or consulting, that would support additional limitations based upon the alleged psychotic features of Plaintiff's depressive disorder.  At the hearing, counsel referenced a "very limiting mental RFC form by [Plaintiff's] case manager," but did not offer it into evidence because it was unsigned.  (Tr.

68-69).  The ALJ kept the record open for Plaintiff to submit additional school records and a signed mental RFC form from Plaintiff's treating psychiatrist, but none of those records were ever submitted by Plaintiff.  (Tr. 68-70).  At the evidentiary hearing, upon questioning from his attorney, Plaintiff briefly testified that he hears his baby crying approximately once per week (Tr. 56), but that he was able to work even when he had those auditory hallucinations (Tr. 55).  He also testified that his current medications help reduce his symptoms.  (Tr. 56).

In a cursory related argument, Plaintiff complains that the ALJ failed to address a single "low GAF score" of 50.  (Doc. 9 at 4, citing Tr. 458).  The record also reflects GAF scores above that score, although all scores appear to be in the 50's.  The GAF Scale reports an individual's overall level of functioning. A GAF score of 41-50 indicates that a person has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious impairment in social or occupational functioning (e.g., no friends and unable to keep a job).  However, GAF scores in the low 50's are not inconsistent with the ability to perform unskilled work.  *See Edwards v. Barnhart*, 383 F. Supp.2d 920, 928 (E.D. Mich. 2005); *see also Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, 34 (2000).  More to the point, despite wide-spread use, "the Commissioner has declined to endorse the [GAF] score for 'use in the Social Security and [SSI] disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. App'x 411 (6th Cir.2006)(additional quotations omitted).   Thus, the ALJ's failure to discuss one or more of Plaintiff's GAF scores was not legal error.

In contrast to Plaintiff's unsupported hypothesis advocating additional mental

limitations, the ALJ's assessment of Plaintiff's mental RFC is supported by substantial evidence in the record. The ALJ placed "strong weight" on the psychological assessment of Dr. Dietz, dated July 5, 2008. Ruling in Plaintiff's favor, the ALJ rejected other consulting opinions that Plaintiff did not have any severe mental impairment. (Tr. 14). Moreover, instead of adopting Dr. Dietz's opinion in its entirety, the ALJ imposed an additional "moderate" limitation in concentration, persistence or pace not found by Dr. Dietz, based upon Plaintiff's record of depression and anxiety. (Tr. 15). The ALJ also discussed the assessment of consulting psychologist, Dr. Chiappone, including his findings that Plaintiff was able to follow instructions, maintain pace, and relate adequately to others during periods when he was working. (Tr. 15). Thus, the ALJ's finding is supported by substantial evidence.

### 3. VE testimony

As a third error, Plaintiff criticizes the ALJ's reliance on the vocational expert ("VE"). Generally, a vocational expert's testimony in response to a hypothetical question accurately portraying the claimant's physical and mental impairments provides substantial evidence in support of the Commissioner's decision that the claimant is not disabled. *See Davis v. Secretary of Health and Human Services,* 915 F.2d 186, 189 (6th Cir. 1987). In this case, however, Plaintiff complains that the VE testified that Plaintiff could perform certain jobs, but that Plaintiff's limitations would preclude him from performing those jobs as they are described in the Dictionary of Occupational Titles ("DOT"), *see* http://www.oalj.dol.gov/libdot.htm.[6] Plaintiff also contends that the hypothetical provided

---

[6] The DOT was originally created by the Employment and Training Administration, and was last updated in 1991. It has largely been replaced by the O*Net but continues to be used as a reference source in Social Security cases.

to the vocational expert did not accurately portray all of Plaintiff's mental impairments.

Although the Commissioner fails to address this particular claim of error in his brief in opposition, that omission does not require this Court to remand absent proof of reversible error. Finding no error, I decline to recommend reversal or remand on this basis.

With respect to the first alleged defect in the VE's testimony, Plaintiff argues that the unskilled jobs of "general office clerk" and of "bookkeeping accounting and auditing clerk," that the VE testified Plaintiff could perform, would require cognitive abilities beyond those that Plaintiff possesses. Plaintiff asserts that the job descriptions that are listed in the DOT require both a reasoning level, and math and language abilities, that exceed the "simple, routine and repetitive" limitation provided to the VE. However, just because a VE's testimony concerning the existence of specified jobs is contrary to the precise description listed in the DOT "does not establish that [the jobs] do not exist." *See Beinlich v. Comm'r of Soc. Sec.*, 345 Fed. Appx. 163, 168, 2009 WL 2877930 *4 (6th Cir., Sept. 9, 2009).

The ALJ did all that was required by social security regulations by inquiring about conflicts. Soc. Sec. Rul. 00-4p imposes an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided "conflicts with [the] information provided in the DOT." Only if the VE testifies that there is a conflict must the ALJ "obtain a reasonable explanation for...[the] apparent conflict." *Lindsley v. Commissioner of Social Security*, 560 F.3d 601, 603 (6th Cir. 2009).

*Lindsley* provides an example of an alleged "conflict" similar to that presented by Plaintiff here. In *Lindsley*, a VE testified that: 1) the plaintiff could perform the job of a "light, unskilled production inspector." *Id.*, 560 F.3d at 604. Although the VE additionally testified that there was "no discrepancy between his opinion and the DOT," the plaintiff pointed out

on appeal that the "occupations listed in the DOT do not include the job description of a 'light, unskilled production inspector.'" *Id.* at 604-605. The Sixth Circuit affirmed the district court's conclusion that the ALJ's determination was supported by substantial evidence. The appellate court found no actual conflict between the DOT and the VE's testimony, given that "the DOT's job classifications are collective descriptions of 'occupations' that can encompass numerous jobs." *Id.* at 605. The use of different terminology, or the fact that the VE's job description did not "align perfectly with the DOT's listed occupation titles" is not evidence of a conflict. *Id.* Thus, once the VE credibly testified that there was no conflict between his testimony and the DOT, and plaintiff was afforded a full opportunity to cross-examine, the ALJ had no duty to interrogate him further. *Id.* at 606. Like in *Lindsley*, the ALJ satisfied his affirmative duty to ask the VE if her testimony was consistent with the DOT. The VE testified that her descriptions were consistent, and that she would notify the ALJ if conflicts arose. (Tr. 72). None were ever identified, either by the VE or by the Plaintiff, until now.

The ALJ is not required "to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge." *Ledford v. Astrue*, 311 Fed. App'x 746, 757 (6th Cir. 2008). Because Plaintiff did not object to the conflicts at the hearing, the ALJ had no duty to explain how any conflict was resolved. *See generally Coleman v. Astrue*, 2010 WL 4094299 (M.D. Tenn. Oct. 18, 2010)(discussing cases requiring remand based on conflicts between VE testimony and DOT).

In sum, no legal error arises from any small discrepancies between the VE's testimony and the DOT job descriptions, based on the record of this case. To the extent

that any discrepancy can be found, it is not grounds for remand because the ALJ satisfied his legal duty to inquire about conflicts at the time of the hearing, and Plaintiff failed to point out the alleged conflict at the administrative level.

In addition, the Plaintiff makes no claim that he cannot perform the third job offered by the VE as an example of an unskilled job that Plaintiff could perform -the job of "inspector, tester, and sorter," including the representative job of "nut sorter." The VE testified that there were approximately 101 such jobs locally, and 12,951 such jobs nationally. Although Plaintiff points to no discrepancies between the description of that job in the DOT and the VE's testimony, Plaintiff argues that if the other two jobs are disregarded, the remaining number of "sorter" jobs he could perform should have been determined to be less than significant. For the reasons discussed, I do not find that the other two jobs can be readily dismissed based upon discrepancies between the VE's testimony and the DOT descriptions. Moreover, what constitutes a "significant number" of jobs must be determined on a case-by-case basis. *See Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). The Sixth Circuit has found as few as 125 jobs in a local area to be "significant." *See Stewart v. Sullivan*, 904 F.2d 708 (6th Cir. 1990); *see also Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 374-75 (6th Cir. 2006)(affirming where VE's testimony was inconsistent with the DOT as to two of three jobs that he testified plaintiff could perform, because the plaintiff failed to raise the conflict at the administrative level, and "the ALJ still could have reasonably found that Martin could perform the third position.").

Plaintiff's second, broader concern with the VE's testimony is that the ALJ failed to incorporate additional mental limitations into the hypothetical provided to the VE. Plaintiff

cites his testimony concerning his difficulties performing past relevant work at both LaRosa's and Servatii's, as well as testimony that he often is anxious and feels paranoid that others are watching him. Plaintiff suggests that the ALJ should have included restrictions that he not work around others, that he cannot perform even simple repetitive tasks, and unspecified limitations relating to the "psychotic features" of his depression. However, no medical source provided an opinion supporting the referenced restrictions. As discussed above, substantial evidence supports the mental limitations determined by the ALJ.

### 4. Credibility

Finally, Plaintiff argues that the ALJ improperly evaluated his credibility. The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some degree of the alleged symptoms," but that Plaintiff's statements and those of his girlfriend "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the RFC determined by the ALJ. (Tr. 16). The ALJ further found that the testimony "of the claimant and his girlfriend was not fully credible regarding the severity of the claimant's conditions and related symptoms and limitations." (Tr. 17). The ALJ noted that Plaintiff's reported symptoms "in the degree and chronicity alleged are not fully supported by objective clinical findings set forth in the record and appear to be somewhat exaggerated." (Tr. 17). As one example, Plaintiff testified that he has a cane, but "there is no indication that it is medically necessary or has been prescribed by a physician." (Tr. 17). The ALJ observed that Plaintiff reports relying "a lot on his girlfriend," but determined that "this appears to be more of a lifestyle choice than to be primarily due to impairment related reasons," considering the

medical evidence in the record and the fact that "[n]o treating or examining physician or mental health specialist has determined that the claimant is disabled." (Tr. 17).

An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, his testimony, and other evidence. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

I find no error. While the ALJ's discussion of Plaintiff's credibility was not extensive, it was legally sufficient. A review of the hearing transcript reflects that Plaintiff relied upon physical limitations relating to back and knee pain as the primary basis for his claimed disability, but the medical records did not fully support his complaints. While an ALJ may not rely solely on a lack of objective evidence to reject claims of disabling pain, it was not error for the ALJ to consider the lack of objective medical evidence as one factor to be considered. *See* 20 C.F.R. §404.1529(c)(2) and (c)(3)(setting forth relevance of treatment a claimant has received for relief of his symptoms when evaluating pain and functional limitations).

The ALJ's reference to inconsistencies in the record and his conclusion that Plaintiff's reliance on his girlfriend was "more of a lifestyle choice" finds support in Plaintiff's girlfriend's testimony and in other evidence of Plaintiff's daily activities. For example,

Plaintiff's girlfriend testified that Plaintiff keeps track of all of his own doctor's appointments, attends those appointments independently, goes to the store with her weekly, and writes down and takes his medications independently (Tr. 65-66). She testified that he spends a typical day watching television and cleaning, is "very sloppy...when he cooks" but occasionally get "in his moods where he'll start cleaning the apartment." (Tr. 67). She testified that if she does not clean their apartment, Plaintiff will. (*Id.*). In addition to Plaintiff's reported daily activities, the ALJ carefully considered the clinical records and objective evidence, all of which failed to support Plaintiff's allegations of disabling mental and physical limitations. Considering the record as a whole, substantial evidence supports the ALJ's credibility assessment.

### III. Conclusion and Recommendation

The ALJ committed no reversible error, and his finding of non-disability is well-supported by substantial evidence in the record. Therefore, **IT IS RECOMMENDED THAT:**

1. The decision of the Commissioner to deny Plaintiff DIB and SSI benefits be **AFFIRMED**.

2. As no further matters remain pending for the Court's review, this case be **CLOSED.**

 */s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

LONNIE ANTICO,                                    Case No. 1:11-cv-640

       Plaintiff,                                    Spiegel, J.
                                                 Bowman, M.J.

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).